## Commonwealth v. Smith

*Charles F. Bowers, Jr.,* for Commonwealth.
*John D. McBride,* for defendant.

KLEIN, *J.,* September 24, 1974—On February 27, 1974, defendant was arrested in the Borough of New Brighton, Beaver County, Pennsylvania, and

charged with a violation of the overweight provisions of The Vehicle Code of April 29, 1959, P.L. 58, sec. 903(a), as amended, 75 P.S. §903(a). Defendant entered a "plea" of guilty after the Commonwealth had presented its case to the magistrate. A fine of $11,100 and $5 in costs was imposed. An appeal followed and the court held a hearing de novo on August 28, 1974.

From the record of the proceedings and from the evidence produced in hearing, we make the following

## FINDINGS OF FACT

1. On February 27, 1974, at approximately 10:15 p.m. defendant, Edward Smith, was operating a six-axle combination tractor-trailer on Pennsylvania Traffic Routes 18 and 65 in the Borough of New Brighton, Beaver County, Pennsylvania.

2. Defendant was stopped by Trooper Gary Kuffer of the Pennsylvania State Police and was directed to drive the rig to the Diamond Milling Company's scales at Fourth Street and Sixth Avenue in New Brighton. New Brighton police officer Ramer and trooper Biehls assisted.

3. The rig was properly weighed on said scales and the gross weight of the unit and its load of hot ingots was 128,850 pounds.

4. The maximum gross weight permitted for the type of rig being operated by defendant is 73,280 pounds, unless being operated under a valid special permit authorized and issued pursuant to 75 P.S.§905, as amended.

5. The weight of defendant's vehicle and load was 55,570 pounds in excess of the weight allowed by statute.

6. Defendant had in his possession, with the vehicle, a special permit authorizing a gross weight of 140,000 pounds over the same route, during daylight hours, for the same type of load, for the period, February 27 to March 2, 1974, but for another similar vehicle owned by defendant's employer.

7. It was night time when defendant was stopped on the highway.

8. Defendant's employer, at the time of the arrest, had in its possession at its place of business, a special hauling permit for the instant rig and load of hot ingots for the period from February 26 to March 1, 1974, authorizing a gross weight of 149,000 pounds, for the route over which defendant was traveling. Night driving privilege was not shown on the face of the permit.

9. The application for said permit indicated "hot ingots," as distinguished from "ingots" and if the application would have contained, in addition, a specific request for same, night time privilege would have been routinely granted and noted on the face of the permit.

10. It is common knowledge that "hot" ingots must be transported within several hours after being available for shipment lest the economic and metallurgical purposes for "hot" ingots be nulified. Further, it is common knowledge that steel mills frequently operate 24 hours per day, seven days a week and that "hot" ingots become available for shipment at any time of day or night.

11. The herein load was the first and only overweight load being transported on the instant rig during the period, February 26 to March 1, 1974.

12. The greater number of "heavy hauling"

loads, including shipments of ingots, carried by defendant's employer involve gross weights of less than 73,280 pounds.

## DISCUSSION

The thrust of the prosecution is three-pronged: (1) the vehicle was overweight and not accompanied by a special hauling permit as required; (2) that if the absence of the valid permit from the vehicle is deemed a mere "clerical error" and a defense, defendant is nevertheless guilty because (A) the correct permit did not authorize night-time driving and (B) in any event, it was not the first trip of said vehicle with an overweight load during the period of the permit, also in violation of said 75 P.S. §905(a). The defense, of course, is to the contra on each point.

## I. PERMIT NOT WITH VEHICLE

It is undisputed that (1) defendant's employer had a valid special permit for the herein load and vehicle and (2) said permit was not being carried in the vehicle during the trip

In the case of Commonwealth v. Thomas, 53 D. & C. 2d 657 (1971), the court held: "Here, as there, there has been an obvious effort to comply with the law and no showing of any bad faith on the part of defendant. No one attempted to evade the provisions and purposes of the overweight provisions of The Vehicle Code and, in fact, there was absolutely no prejudice to anyone as the result of the error of defendant's employer. . . . Therefore, this being a penal statute subject to the rule of *strict construction deserving of a reasonable interpretation consistent with its general purposes* [Com-

monwealth v. Burall, 146 Pa. Superior Ct. 525 (1941); Commonwealth v. Walker, 219 Pa. Superior Ct. 167 (1971)]; and Commonwealth v. Wiggins, [18 Bucks 554 (1968)], we are satisfied that the conviction would work an injustice and that the appeal should be sustained." (Emphasis supplied.)

" . . . the statute [The Vehicle Code] must be given a common-sense interpretation." Commonwealth v. Walkinshaw, 373 Pa. 419, 96 A.2d 384 (1953).

## II. NIGHTTIME VIOLATION

Here again, it is undisputed that defendant was operating at night and the permit for the vehicle in question did not authorize, on its face, a movement after daylight hours. However, it is also uncontested that the application for the herein permit stated for "hot ingots" and that defendant's employer frequently applied for special permits for both "ingots" and "hot ingots." It takes no mental giant to recognize that the word "hot" is added for a specific reason and is not mere surplusage. The shipment and delivery of cold ingots from eight to sixteen hours later than when first available would have an inconsequential economic impact and no impact whatsoever from a fabricator's point of view. A hot ingot, however, need not be "reheated" for fabrication or, at worst, the reheating time and expense would be greatly reduced. In addition, for certain products, a cold ingot would not work because of the chemical and metallurgical changes which necessarily occur in the cooling process.

The evidence produced on cross-examination of the Commonwealth's witnesses makes it clear that there has been an on-going controversy and

numerous discussions in the steel-making districts concerning whether an application for special permit to transport "hot ingots" carries with it an implicit request for night time privileges. As a matter of fact, *as a result of the herein arrest,* the Commonwealth has now adopted a firm policy in regard to this matter.

Further, the steel industry is a vital component of the American economy. In Pennsylvania it is of yet greater significance, proportionally, and Beaver County likely would not now be an industrial county with a population in excess of 200,000 were it not for the development and expansion of steel and its related industries. Public policy requires government at all levels to aid and facilitate such industries and not hinder them by erecting technical "roadblocks" or by otherwise harassing industry operations.

Consequently, we hold that the application for transportation of "hot ingots" implicitly requested a night driving privilege and only the lack of knowledge or negligence of the permit office employes failed to provide same on the face of the permit. The grant of a permit for hauling "hot ingots" in an overweight load carries with it nighttime authorization.

Still further: " 'The purpose of statutes prohibiting the use of public highways by motor vehicles of excessive weight is to prevent injury to the public property in the form of damage to roads, bridges, etc. and further to insure the safety of persons traveling such highways.' " Commonwealth v. Curley, 189 P. Superior Ct. 506, 151 A.2d 656 (1959).

Obviously, if special permits are granted for overweight loads — as they routinely are because

such loads cannot be broken down in a feasible manner — then the matter of damage to roads and bridges does not apply (recognizing that the department decrees the route to be traveled so as to minimize potential damage). And, of course, the "damage" would be identical whether it occurs in daylight hours or at night. Therefore, the purpose of the statute here involved is really one of safety to the traveling public. The increased hazard to the public of *out-size* vehicles (extra wide or extra long) on the roads at night is obvious. Visibility is greatly reduced by darkness and overtaking or passing by an out-size vehicle traveling in the opposite direction may be quite dangerous. Such issue with respect to added weight on a *normal, "legal" size rig* is not so clear. The excess weight may cause a rig to go a little slower on grades but the *difference* in speed between a vehicle of 73,280 pound gross weight and one of 130,000 pounds is minimal and presents very little, if any, increased hazard....

## CONCLUSION

The evidence establishes that defendant's employer applies for special permits almost every business day, that, at the time of the arrest, defendant's employer had three or four outstanding permits for overweight loads to be transported from Midland to Ellwood City and that it obtains permits for such overweight trips routinely throughout the year.

For all these reasons, we make the following

## ORDER

And now, September 24, 1974, after hearing de novo, we find defendant not guilty.

Footnote: Also see Commonwealth v. Kyler, this volume.